PETER J. LONG,

                        Plaintiff,

                                                    Case No. 14-cv-1218-pp

        v.

ROMAN KAPLAN,

                        Defendant.

## ORDER DENYING PLAINTIFF'S AND DEFENDANT'S MOTIONS FOR SUMMARY JUDGMENT (DKT. NOS. 59, 11, 145)

Plaintiff Peter J. Long, a Wisconsin state prisoner, filed a complaint under 42 U.S.C §1983, alleging that the defendant violated his civil rights. Dkt. No. 1. On October 7, 2014, Judge William Griesbach screened the complaint, and allowed the plaintiff to proceed with two claims: (1) an Eighth Amendment claim that Dr. Roman Kaplan showed deliberate indifference toward the plaintiff's serious medical needs by abruptly discontinuing his prescription medication for Tramadol, and (2) Wisconsin state law negligence and medical malpractice claims related to those facts. Dkt. No. 3 at 2.

Both parties have filed motions for summary judgment, and after a long and tortured procedural history, those motions are fully briefed (and then some). This order resolves the motions.

## I.    PROCEDURAL HISTORY

The court must recount the messy procedural history of this case, to identify the documents upon which it has relied in deciding these motions.

On October 1, 2014, while he was in custody at the Prairie du Chien Correctional Institution, the plaintiff filed a twenty-four-page complaint against the defendant. Dkt. No. 1. The case was assigned to Chief Judge Griesbach, who screened the complaint. Dkt. No. 3. The defendant answered on December 5, 2014, dkt. no. 8, and Judge Griesbach issued a scheduling order on December 11, 2014, dkt. no. 9. The case was reassigned to Judge Pepper on December 29, 2014.

A.     The Plaintiff's Motion for Summary Judgment

Judge Griesbach had set a deadline of March 11, 2015 for the parties to complete discovery, and an April 10, 2015 deadline for filing dispositive motions. Dkt. No. 9. The plaintiff, however, filed his original motion for summary judgment on January 8, 2015, less than a month after the scheduling order, two months before the discovery deadline, and three months before the dispositive motions deadline. Dkt. No. 11. He also filed a supporting brief, dkt. no. 12, a statement of stipulated material facts, dkt. no. 13, a statement of proposed material facts, dkt. no. 14, and two declarations, dkt. nos. 15, 16. The defendant filed his opposition response to the motion, dkt. no. 18, his proposed findings of fact, dkt. no. 19, a response to the plaintiff's proposed material facts, dkt. no. 20, a response to the plaintiff's statement of "stipulated" facts, dkt. no. 21, and two declarations, dkt. nos. 22 and 23. The plaintiff then filed a reply brief, dkt. no. 25, but he also filed a response to the defendant's proposed findings of fact, dkt. no. 26, a reply to the defendant's response to his proposed material facts, dkt. no. 27, and responses to the

defendant's two declarations, dkt. nos. 28, 29. Neither the Federal Rules of Civil Procedure nor this court's local rules allow the last four documents. At any rate, at this point, the plaintiff's motion had been fully briefed.

B.    The Defendant's Motion for Summary Judgment

On April 10, 2015—the deadline Judge Griesbach had set—the defendant filed *his* motion for summary judgment, dkt. no. 30, along with his supporting brief, dkt. no. 31, his proposed findings of fact, dkt. no. 32, and a declaration, dkt. no. 33. The plaintiff's response was due within thirty days—by May 11, 2015. But the plaintiff asked for an extension of time, dkt. no. 34, and the court gave it to him in a text-only order dated May 8, 2015. The order required the plaintiff to file his response by June 12, 2015.

On June 15, 2015, the court received the plaintiff's opposition brief, dkt. no. 36, response to the defendant's proposed findings of fact, dkt. no. 37, two responses to the defendant's declaration, dkt. nos. 38 and 39, a declaration from the plaintiff, dkt. no. 40, and declarations from two of the plaintiff's fellow inmates at Prairie du Chien, dkt. nos. 41, 42. The defendant filed his reply on June 25, 2015, dkt. no. 44, along with his reply brief, dkt. no. 45. At this point, the *defendant's* summary judgment motion was fully briefed, and the court had both parties' motions under advisement.

C.    The Plaintiff's Motion to Stay Proceedings

On August 27, 2015, however, the plaintiff filed a motion asking the court to stay the proceedings. Dkt. No. 47. The motion indicated that the plaintiff had been able to secure a medical expert to assist him with his

deliberate indifference claim, a doctor from O'Fallon, Missouri named James Sturm. <u>Id.</u> The plaintiff asked the court to stay any rulings on the summary judgment motions until the plaintiff could obtain a declaration from Dr. Sturm, and file it with the court. <u>Id.</u>

    D.    <u>The Court's Denial of Both Summary Judgment Motions</u>

The court granted the plaintiff's request. Dkt. No. 49. It denied both summary judgment motions without prejudice, and set new deadlines. It required the plaintiff to file his expert witness report by November 2, 2015, the defendant to identify any expert witness and file that witness's report by December 4, 2015, and the parties to file summary judgment motions by January 15, 2016. <u>Id.</u> The court told the parties that they could, if they so chose, re-file their original motions for summary judgment, rather than filing new ones. <u>Id.</u> at 5.

    E.    <u>The Plaintiff's Request to Stand on His Original Motion</u>

The plaintiff filed Dr. Sturm's declaration on October 28, 2015, dkt. no. 50, and with the court's permission, he filed an amended expert witness disclosure on January 8, 2016, dkt. no. 53. On January 14, 2016, the plaintiff asked leave to stand on his original summary judgment motion, dkt. no. 54, but filed another declaration from Sturm and his own declaration, dkt. nos. 55, 56. The defendant responded by filing a motion and brief, asking the court to exclude Dr. Sturm as a witness. Dkt. No. 57.

F.     The Defendant's New Motion for Summary Judgment

At the same time, the defendant filed a new motion for summary judgment, dkt. no. 59, a new brief, dkt. no. 61, new proposed findings of fact, dkt. no. 60, and several new declarations, dkt. nos. 62-65. The defendant filed a disclosure indicating that while he had not retained any experts, there were several Department of Corrections medical employees who might act as expert witnesses. Dkt. No. 58-1.

The plaintiff filed a brief in opposition to the defendant's motion to exlude Dr. Sturm. Dkt. No. 69. He also filed a declaration, dkt. no. 70, and his amended expert disclosures, dkt. no. 71. He further asked for additional time to respond to the defendant's new summary judgment motion, dkt. no. 72; the court granted that motion, and gave him a deadline of March 18, 2016 by which to respond, dkt. no. 74. The defendant filed a reply in support of his to exclude experts, dkt. no. 76, along with a supplemental declaration from one of the doctors the defendant had identified as a possible expert, dkt. no. 77.

G.     The Defendant's Request to Exclude Sturm's Evidence

On February 15, 2016, the court received a letter from counsel for the defendant. Dkt. No. 78. She pointed out that, while the plaintiff had asked to stand on his original summary judgment brief, he had submitted new evidence (specifically, Sturm's report) without modifying his summary judgment briefs to include references to what the plaintiff considered the relevant portions of that evidence. Id. Counsel asked the court to exclude Sturm's statements; in the alternative, she asked that if the court allowed the plaintiff to supplement his

motion for summary judgment to remedy this problem, the court give the defendant an opportunity to respond. Id.

H.    The Dispute Over the Discovery Deadline

This prompted the plaintiff to file a motion asking the court to "clarify" the discovery deadline "for purposes of summary judgment." Dkt. No. 79. He said he'd received discovery demands from the defendant dated February 2, 2016, related to Dr. Sturm, but that he believed that the discovery deadline had passed on March 11, 2015. Id. at 1-2. He acknowledged that when the court set a new deadline for filing summary judgment motions, the discovery deadline may have been extended, but he believed that the court had intended to extend it only until January 15, 2016. Id. at 2. The defendant responded that the court had not set a date for concluding discovery on experts. Dkt. No. 81. He maintained that his demands for discovery regarding Sturm were timely, and asked the court to compel the plaintiff to respond. Id.

I.    The Plaintiff's Response to the Defendant's New Motion for Summary Judgment

At 10:46 a.m. on March 23, 2016, the court received a "reply" brief from the defendant in support of his motion for summary judgment. Dkt. No. 82. The brief noted that the court had required the plaintiff to respond to the defendant's new summary judgment motion by March 18, 2016, and that the plaintiff had failed to do so. It asked the court to grant summary judgment to the defendant. Id.

At 1:54 p.m. that same day—March 23, 2016, five days after the plaintiff's responsive materials were due—the court received the plaintiff's

response to the defendant's new summary judgment motion and accompanying materials. Dkt. Nos. 83-89. The next day, the court received a motion from the defendant, asking for an extension of time to respond. Dkt. No. 91. Before the court had even ruled on the defendant's request for an extension of time, the plaintiff had filed a motion for leave to supplement his summary judgment motion, dkt. no. 92, and a declaration, dkt. no. 93. He also objected to the defendant's request for an extension of time (even though he himself had asked for a couple of extensions, both of which the court had granted). Dkt. No. 94.

On April 1, 2016, the defendant filed a letter, asking the court to allow him to withdraw his "reply"—the one in which he'd argued that the plaintiff had not timely responded to the defendant's motion for summary judgment. Dkt. No. 96. That same day, the defendant filed a response to the plaintiff's motion for leave to supplement his motion for summary judgment. Dkt. No. 97.

J.     The Court's Decision

The court was drowning in motions, and modifications to motions, and oppositions to modifications to motions. On April 1, 2016, the court issued an order, attempting to sort out the "procedural snarl" that it admitted had resulted, in part, from some of its own imprecise language. Dkt. No. 98 at 8-9. The court allowed the plaintiff to file Dr. Sturm's declaration (dkt. no. 55) and his own (dkt. no. 56), and denied his request to stand on his original brief. Id. at 10. The court denied the defendant's motion to exclude Sturm (dkt. no. 57). Id. The court allowed the plaintiff to include information about Sturm that he'd filed at dkt. nos. 71 and 73. Id. The court denied the defendant's motion to

compel the plaintiff to respond to the discovery demands. Id. at 10-11. The court took care of a few of the other motions, and then set a new schedule: the plaintiff had to respond to the defendant's discovery demands regarding Sturm by May 13, 2016, id. at 11-12, and the court would schedule a telephone hearing after that date to talk about next steps, id. at 12.

K.     The Status Conference

On June 10, 2016, the court held the status conference. Dkt. No. 107. Counsel for the defendant confirmed that the plaintiff had provided the discovery the defendant had requested, but indicated that she needed to depose Dr. Sturm. Id. at 1. The plaintiff objected. The court informed the plaintiff that the defendant had a right to conduct the deposition, and the parties began to discuss the logistics of setting up such a deposition. Id. As it became evident that there were logistical complications with the defendant conducting such a deposition of a witness in Missouri when the plaintiff was representing himself in custody, the court asked the plaintiff to file a motion for appointment of counsel. Id. The court indicated that it would appoint counsel for the limited purpose of helping the plaintiff defend Sturm's deposition. Id. at 2. Once the deposition had taken place, the court said, it would set a deadline for the plaintiff to supplement his summary judgment motion (if he wanted to), and for the defendant to reply to the plaintiff's response to the defendant's motion for summary judgment. Id.

L.    Appointment of Counsel

The plaintiff filed his motion to appoint counsel, as the court had asked him to do. Dkt. No. 108. The court granted that motion to the extent that it asked for a lawyer to help the plaintiff schedule and defend Sturm's deposition; it denied his request that the lawyer also help him depose some of the defendant's witnesses. Dkt. No. 111. On November 14, 2016, the court received the plaintiff's agreement to accept limited representation from appointed counsel, dkt. no. 130, and the court appointed a lawyer to represent the plaintiff for the limited purpose of deposition Sturm, dkt. no. 129.

M.    More Disputes Regarding Discovery

Meanwhile, between the court's April 1, 2016 order and the June 10, 2016 status conference, the plaintiff had filed interrogatories with the court,[1] which it received May 10, 2016. One set of interrogatories related to one of the doctors the defendant had indicated he might use as an expert witness, dkt. no. 100; the second set was directed to the defendant, dkt. no. 101.

On July 8, 2016, the plaintiff filed a motion, asking the court to compel the defendant to respond to these interrogatories. Dkt. No. 114. The defendant responded. Dkt. No. 118. The plaintiff replied. Dkt. No. 121. The plaintiff then filed a *second* request for production of documents regarding the proposed expert, dkt. no. 122, and a motion to compel the defendant to respond to his demands, dkt. no. 123. Of course, the defendant responded. Dkt. No. 124.  And the defendant filed a motion for a protective order, arguing that documents the

---

[1] Parties serve discovery demands on *each other*; they are not to file them with the court.

plaintiff had demanded contained HIPPA-protected information. Dkt. No. 131. The plaintiff came right back and filed another motion to compel, along with an objection to the protective order request. Dkt. No. 133. The defendant then filed *another* motion for a protective order. Dkt. No. 136.

On February 8, 2017, the court issued an order, confessing that it was mystified by all the docket activity that had taken place since the June 10 status conference. Dkt. No. 137. It reiterated that the deadline for conducting fact discovery had passed on March 11, 2015, and that the deadline for the plaintiff to respond to the defendant's expert discovery had expired on May 13, 2016. Id. at 8. The court denied all the outstanding motions, and instructed the parties that there would be *no further discovery* in the case, other than Dr. Sturm's deposition. Id. The court ordered that ten days after the parties had completed Sturm's deposition, the defendant should notify the court of that fact; the defendant also had ten days after the transcript of the deposition was finalized to notify the court of *that* fact. Id. at 9.

Even as the court was drafting that order, the clerk's office received the plaintiff's third set of interrogatories, dkt. no. 138, a demand letter from the plaintiff, dkt. no. 139, and two sets of objections to the defendant's responses to his earlier requests for admissions, dkt. nos. 141-142. After the plaintiff received the court's February 8, 2017 order, he withdrew all those documents. Dkt. No. 144.

N.     The Plaintiff's Supplemental Brief

Recall that at the end of the June 10, 2016 status conference, the court had told the plaintiff that after the parties had completed the Sturm deposition, the court would give the plaintiff a deadline by which to supplement his summary judgment motion if he chose to do so. On February 17, 2017—even though the defendant had not yet deposed Sturm, and even though the court had not yet given the plaintiff a deadline by which to supplement his motion for summary judgment—the plaintiff filed a supplement to his motion for summary judgment. Dkt. No. 145. He also filed a statement of stipulated material facts, dkt. no. 146, a statement of proposed material facts, dkt. no. 147, and a declaration, dkt. no. 148.

The defendant construed this as the plaintiff's renewed motion for summary judgment, and asked the court to give him until thirty days after Sturm's deposition to respond. Dkt. No. 150. The plaintiff objected, accusing the defendant of delaying Sturm's deposition. Dkt. No. 152. The defendant replied with the equivalent of "I did not!" Dkt. No. 153.

On March 10, 2017, the court issued an order, granting the defendant's request for an extension of time until thirty days after Sturm's deposition to respond to the plaintiff's supplement to his summary judgment motion. Dkt. No. 155. The court observed that it had not contemplated that the parties would file any supplemental summary judgment materials until after the deposition. Id. at 2. It reminded the parties that it had given the defendant deadlines for notifying the court of when Sturm's deposition was complete, and

when the transcript of the deposition had been finalized. Id. The court stated

that it would issue a briefing schedule after it had received those notices. Id.

O.      Sturm's Deposition and the New Schedule

On June 13, 2017, the defendant notified the court that Strum's

deposition was complete, and that the transcript had been finalized. Dkt. No.

156.

On June 20, 2017, the court issued its final scheduling order. Dkt. No.

157. Regarding the ***defendant's*** motion for summary judgment:

The defendant had filed his "new," post-retention-of-Sturm summary

judgment motion on January 15, 2016, at docket number 59. He filed six

documents in support of that motion: proposed findings of fact, dkt. no. 60; a

brief, dkt. no 61; and four declarations, dkt. nos. 62-65.

The plaintiff had filed an opposition brief, dkt. no. 83, along with a

response to the proposed findings of fact, dkt. no. 84, and responses to two of

the declarations, dkt. nos. 85, 86.

The court ordered the defendant to file his reply brief by July 7, 2017.

Dkt. No. 157 at 8. The court ordered that the plaintiff was not to file any

response to this pleading. Id.

Regarding the ***plaintiff's*** motions for summary judgment:

The plaintiff had filed his original motion for summary judgment on

January 8, 2015, dkt. no. 11, along with a brief, dkt. no. 12, a statement of

stipulated material facts, dkt. no. 13, a statement of proposed material fact,

dkt. no. 14, and his declaration, dkt. no. 15. The court also had allowed him to

file Sturm's declaration, dkt. no. 55, and his declaration regarding some research he'd done on the National Commission on Correctional Health Care's Standard for Opioid Treatment Programs in Correctional Facilities, dkt. no. 56. He had filed a supplemental motion for summary judgment on February 17, 2017, dkt. no. 145, along with a statement of stipulated material facts, dkt. no. 146, a statement of proposed material facts, dkt. no. 147, and a declaration, dkt. no. 148.

The court ordered the defendant to respond to both motions by July 21, 2017. Dkt. No. 157 at 8. It ordered that if the plaintiff wanted to file a reply brief in support of his motions, he had to file it by the end of the day on August 11, 2017. Id.

P.     The Remaining Filings

On July 7, 2017, the defendant filed several documents. He filed his reply brief. Dkt. No. 164. He filed a response to the plaintiff's March 23, 2016 response to the defendant's proposed findings of fact (the ones the plaintiff had filed in response to the defendant's "new" motion for summary judgment), dkt. no. 160; a response to some unsolicited proposed findings of fact that the plaintiff had filed with his response to the defendant's "new" summary judgment motion, dkt. nos. 158, 159; and a declaration with numerous attachments, dkt. no. 161. The defendant also filed a motion, asking the court to allow him to file supplemental proposed findings of fact, dkt. no. 162, and provided those proposed supplemental findings, dkt. no. 163.

The court granted the defendant's request to file supplemental proposed findings of fact, and gave the plaintiff a deadline of August 11, 2017 to file responding proposed findings. Dkt. No. 165. After the court had ruled, it received an objection from the plaintiff. Dkt. No. 166.

On July 20, 2017, the defendant filed his response to the plaintiff's summary judgment motions, dkt. no. 167, along with responses to the plaintiff's proposed findings of fact, dkt. nos. 168, 169.

On July 31, 2017, the parties filed a stipulation, notifying the court that the lawyer who'd helped the plaintiff defend Sturm's deposition had also agreed to represent him in preparing the remaining pleadings that were due. Dkt. No. 171. The parties asked for an extension of time for counsel to file the plaintiff's reply brief, until the end of the day on August 25, 2017. Id. The court granted that request on August 1, 2017.

On August 25, 2017, the plaintiff filed his reply brief in support of his original motion for summary judgment, dkt. no. 172, his response to the defendant's supplemental findings of fact, dkt. no. 173, and his declaration, dkt. no. 174. The defendant then filed a reply to the response to the supplemental findings. Dkt. No. 175.

## II. THE RELEVANT DOCUMENTS

The court considers the plaintiff's original (dkt. no. 11) motion for summary judgment, and his original and supplemental briefs in support of that motion (dkt. nos. 12, 145); the two sets of proposed facts he filed originally (dkt. nos. 13, 14), as well as the two sets he filed with his supplemental brief

14

(dkt. nos. 146, 147—which encompass the facts in dkt. nos. 13-14 and 87-88), and his response to the defendant's supplemental proposed findings (dkt. no. 173); the three declarations he has filed (dkt. nos. 15, 148, 175); the plaintiff's opposition brief (dkt. no. 83), his opposing findings of fact (dkt. no. 84), and his opposing declarations (dkt. nos. 85, 86); the Sturm declaration the court allowed the plaintiff to file (dkt. no. 55), and the plaintiff's accompanying declaration on opioid standards in prisons (dkt. no. 56).

The court considers the defendant's "new" motion for summary judgment (dkt. no. 59), the brief in support of that motion (dkt. no. 61), the defendant's original and supplemental findings of fact (dkt. nos. 60, 163), his reply brief in support of the motion (dkt. no. 164), and the declarations the defendant has filed (dkt. nos. 62-65, 161); the defendant's brief in opposition to the plaintiff's motion for summary judgment (dkt. no. 167), and his opposition to the plaintiff's proposed findings of fact (dkt. nos. 168, 169).

## III.    FACTS[2]

At the time he filed his complaint, the plaintiff was an inmate in the Wisconsin Department of Corrections. Dkt. No. 1. The defendant, Roman Kaplan, is a medical doctor who primarily works at the Dodge Correctional

---

[2] The court takes facts in this section from the defendant's "Proposed Findings of Fact," dkt. no. 60, the defendant's "Supplemental Proposed Findings of Fact," dkt. no. 163, the plaintiff's "Statement of Proposed Material Facts," dkt. no. 147, the plaintiff's "Statement of Stipulated Facts," dkt. no. 146, and the plaintiff's "Response to Defendant's Supplemental Proposed Findings of Fact," dkt. no 173. The court takes additional facts from the plaintiff's sworn complaint, dkt. no. 1, which the Seventh Circuit has instructed district courts to construe at the summary judgment stage as an affidavit. Ford v. Wilson, 90 F.3d 245, 246-47 (7th Cir. 1996).

Institution ("DCI"). Dkt. No. 60 at ¶¶1-2. DCI is the "intake prison facility" for the DOC, and the plaintiff passed through DCI several different times between 2009 and 2013. Id. at ¶7.

On June 13, 2009, the plaintiff suffered a knee injury while incarcerated at the Drug Abuse Correctional Center ("DACC"). Dkt. No. 147 at ¶1. The plaintiff "buckled" his knee in the wrong direction, and he "completely severed his ACL and tore both his lateral meniscus and medial meniscus in his right knee." Id. During this time, the defendant treated inmates at DCI and DACC. Dkt. No. 146 at ¶4. According to the plaintiff, the defendant "minimized and misdiagnosed [his] knee injury" as a sprain. Dkt. No. 147 at ¶2.

Several months later, in October 2009, the DOC transferred the plaintiff to Fox Lake Correctional Institution ("FLCI"). Id. at ¶3. At FLCI, the plaintiff "finally receive[d] adequate medical care to fix his right knee." Id. The plaintiff got an MRI on his knee in January 2010, and Doctor Grossman performed surgery on his knee in February 2010. Dkt. No. 146 at ¶¶6-7. The plaintiff asserts that this was no minor surgery—he was under general anesthetic for some four hours and had a tourniquet on his leg for some 95 minutes. Dkt. No. 173 at ¶1. Since the surgery, the plaintiff has suffered from chronic pain in his right knee from "bone-on-bone" contact between the medial and meniscectomies. Dkt. No. 147 at ¶4. The plaintiff asserts that this "bone on bone" pain is not "the result of obesity, wear and tear, or part of the normal aging process." Dkt. No. 173 at ¶1.

Neither party explains what happened for the next two years or so (between February 2010 and November 2011). On November 17, 2011, the plaintiff arrived at DCI. Dkt. No. 60 at ¶8. Nurse Joni Dykstra did an intake screening/medical history and noted that the plaintiff had a prescription from an outside doctor for a narcotic pain medication called Tramadol. Id. at ¶¶9, 24-25. The prescription was for two 50mg tablets up to three times a day as needed for pain. Id. at ¶9. An "intake physician" must review the list of prescription medications that an inmate arrives with, and must decide to either continue or discontinue the medication. Id. at ¶¶20-21. The intake physician that day was Doctor Scott Hoftiezer,[3] and he approved the plaintiff's prescription for Tramadol until a DOC doctor could see and review the plaintiff's files. [4] Id. at ¶¶10-11.

Several days later, on September 23, 2011, the plaintiff saw Doctor Thomas Williams for a physical exam. Id. at ¶12. Dr. Williams discontinued the prescription for Tramadol effective immediately. Id. at ¶13. Neither party explains why Dr. Williams discontinued the medication. At that time, the plaintiff did not report any withdrawal symptoms. Id. at ¶14.

---

[3] Scott Hoftiezer is a medical doctor who has been licensed to practice medicine in Wisconsin since 1991. Dkt. No. 60 at ¶3. He is employed by the DOC and works at DCI. Id. at ¶4. He also is the Associate Medical Director of the Bureau of Health Services (BHS) for the DOC. Id. at ¶5.

[4] The intake physician typically makes the determination to continue or discontinue based solely on medical records, without face-to-face interaction with the inmate. Dkt. No. 60 at ¶¶18-19.

Neither party explains what happened for the next year and a half or so (between September 2011 and January 2013). On January 15, 2013, the DOC released the plaintiff from FLCI. Dkt. No. 147 at ¶5. Once the plaintiff was out of custody, an outside doctor from the "Fox Cities Community Clinic" prescribed him Tramadol again, in the same dosage as before. Id.; see also Dkt. No. 60 at ¶16.

About six months later, on July 9, 2013, the plaintiff was booked into the Washington County Jail ("WCJ") for an issue relating to operating without a license. Dkt. No. 147 at ¶6. WCJ medical staff conducted a physical and mental health evaluation on the plaintiff and continued his prescription for Tramadol. Id. at ¶¶7-8; see also Dkt. No. 146 at ¶10. The plaintiff was at WCJ for about two months (between July 9 and September 3, 2013) and he received Tramadol the entire time. Dkt. No. 147 at ¶7.

On September 3, 2013, the plaintiff returned to DCI. Dkt. No. 60 at ¶15. Nurse Carmen Zacharias conducted an intake screening/medical history and noted that the plaintiff had the same prescription for Tramadol that he had had in November 2011. Id. at ¶¶15-16. The defendant was the intake physician that day. Id. at ¶17. The defendant reviewed the plaintiff's prescription medications and discontinued the plaintiff's prescription for Tramadol effective immediately. Dkt. No. 60 at ¶¶17, 22, 28; see also Dkt. No. 146 at ¶14.

The defendant explains that the only document he looked at to determine which prescription medications should be continued or discontinued was the "list of current medications" compiled by the intake nurse during

screening; he asserts that looking only at this list was "[c]onsistent with normal procedure." Dkt. No. 62 at ¶21. The defendant says that he decided to discontinue the plaintiff's prescription for Tramadol for several reasons. Id. at ¶¶24-26. First, Tramadol was not on the DOC's approved list of medications at the time, "because it is addictive and has been found to have multiple side effects." Id. at ¶24. Second, the defendant says that in his medical opinion, "Tramadol should not be used as long-term pain management, especially in patients with a history of drug and alcohol abuse." Id. at ¶25. Third, he observes that he continued the plaintiff's prescription for Meloxicam, "a non-steroidal anti-inflammatory pain medication," and that he additionally prescribed Tylenol 500 mg TID PRN (three times a day as needed for two months); he indicates that "[t]he combination of Meloxicam and Tylenol provides substantial pain relief comparable to a low-dose opioid." Id. at ¶27; see also Dkt. No. 146 at ¶15. He asserts that the plaintiff had the Meloxicam and the Tylenol available to him in his cell, to take as needed. Id. at ¶28. Fourth, the defendant indicates that while it usually takes ten to fourteen days for an inmate to see a doctor for the intake physical, the defendant ordered "an expedited intake exam for [the plaintiff] so that his needs would be evaluated sooner." Id. at ¶29. For all of these reasons, the defendant says, "[a]s was standard practice at the time, [the defendant] discontinued [the plaintiff's] Tramadol prescription." Id. at ¶26.

The next day, on September 4, 2013, the plaintiff received "bubble packs" of Meloxicam 15mg, Omeprazole 40mg, and Buspirone 10mg to take as needed.

Dkt. No. 146 at ¶22. That same day, the plaintiff told a correctional officer on staff that he was going through "serious withdrawals" from lack of Tramadol. Dkt. No. 147 at ¶28. The plaintiff explains that he experienced "restlessness, watering eyes, runny nose, nausea, sweating, severe muscle aches, pain, and suffering." Id. at ¶21. He also suffered from vomiting and increased knee pain. Dkt. No. 173 at ¶6. The plaintiff's cellmate at the time, Michael Subject, witnessed the symptoms. Dkt. No. 147 at ¶27.

For the next few days, between September 4 and September 8, 2013, the plaintiff filed several HSU requests and spoke to different people about his withdrawal symptoms. Dkt. No. 146 at ¶¶24-26; see also Dkt. No. 147 at ¶¶28-29, 52-53. On September 5, 2013, the plaintiff requested ice for his knee and submitted a medical supply refill request for Tramadol. Dkt. No. 60 at ¶45; see also Dkt. No. 146 at ¶25. On September 7, 2013, the plaintiff wrote to HSU manager Dittmann, requesting Tramadol and stating that he could not be taken off the prescription "cold turkey." Dkt. No. 146 at ¶26. The plaintiff's withdrawal symptoms ended on September 8, 2013. Dkt. No 147 at ¶21. The plaintiff suffered from the withdrawal symptoms for six days.

On September 9, 2013, the day after the plaintiff's withdrawal symptoms ended, Dr. Williams saw the plaintiff for his physical exam. Id. at ¶30. According to the plaintiff, he described his withdrawal symptoms, and Dr. Williams responded, "I would NOT have done it that was but that was his [the defendant's] decision." Id. at ¶31. Dr. Williams did not put the plaintiff back on Tramadol or prescribe any other narcotic pain medication. Dkt. No. 60 at ¶50.

Instead, he continued the Meloxicam and ordered ice every evening as needed.
Id.

After his physical exam, the plaintiff filed more HSU requests. Id. at
¶¶46, 51. He filed some requests with Dr. Williams and others with HSU
Manager Dittman. Dkt. No. 146 at ¶¶28-30. In the requests, the plaintiff asked
for Tramadol, a low bunk restriction, ibuprofen instead of acetaminophen, and
a higher dosage of acetaminophen. Dkt. No. 62-1 at 78-83. The defendant says
that he was not aware of any of these requests. Dkt. No. 60 at ¶52. The
defendant states that the last time he had an in-person meeting with the
plaintiff was in June 2009 at DACC. Dkt. No. 62 at ¶10. He also states that the
last time he worked on this matter was on September 3, 2013, when he
discontinued the plaintiff's prescription for Tramadol. Id. at ¶41. After that
date, the defendant did not handle any of the plaintiff's HSU requests, nor was
he notified or aware of any withdrawal symptoms that the plaintiff may have
had. Id. at ¶38.

## IV.    DISCUSSION

### A.    Summary Judgment Standard

"The court shall grant summary judgment if the movant shows that there
is no genuine dispute as to any material fact and the movant is entitled to
judgment as a matter of law." Fed. R. Civ. P. 56(a); see also Anderson v. Liberty
Lobby, Inc., 477 U.S. 242, 248 (1986); Celotex Corp. v. Catrett, 477 U.S. 317,
324 (1986); Ames v. Home Depot U.S.A., Inc., 629 F.3d 665, 668 (7th Cir.
2011). "Material facts" are those under the applicable substantive law that

"might affect the outcome of the suit." <u>Anderson</u>, 477 U.S. at 248. A dispute

over a "material fact" is "genuine" if "the evidence is such that a reasonable

jury could return a verdict for the nonmoving party." <u>Id.</u>

A party asserting that a fact cannot be disputed or is genuinely disputed

must support the assertion by:

> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
>
> (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1). "An affidavit or declaration used to support or oppose a

motion must be made on personal knowledge, set out facts that would be

admissible in evidence, and show that the affiant or declarant is competent to

testify on the matters stated." Fed. R. Civ. P. 56(c)(4).

> B.    <u>Eighth Amendment Deliberate Indifference Claim</u>

>    1.    *Deliberate Indifference Standard*

"[T]he Eighth Amendment safeguards the prisoner against a lack of

medical care that 'may result in pain and suffering which no one suggests

would serve any penological purpose.'" <u>Petties v. Carter</u>, 836 F.3d 722, 727 (7th

Cir. 2016) (quoting <u>Estelle v. Gamble</u>, 429 U.S. 97, 103 (1976)). "Deliberate

indifference to serious medical needs of a prisoner constitutes the unnecessary

and wanton infliction of pain forbidden by the Constitution." <u>Arnett v. Webster</u>,

68 F.3d 742, 750 (7th Cir. 2011) (quoting <u>Rodriguez v. Plymouth Ambulance</u>

Serv., 577 F.3d 816, 828 (7th Cir. 2009)). Determining whether prison officials have violated the Eighth Amendment "in the prison medical context," a court looks first at whether "a plaintiff suffered from an objectively serious medical condition," and then considers "whether the individual defendant was deliberately indifferent to that condition." Petties, 836 F.3d at 727 (citing Farmer v. Brennan, 511 U.S. 825, 834 (1994); Berry v. Peterman, 604 F.3d 435, 440 (7th Cir. 2010)).

Regarding the objective element, a plaintiff "must present evidence supporting the conclusion that he had an objectively serious medical need." McGee v. Adams, 721 F.3d 474, 480 (7th Cir. 2013) (quoting Johnson v. Doughty, 433 F.3d 1001, 1010 (7th Cir. 2006)). "A medical need is considered sufficiently serious if the inmate's condition has been diagnosed by a physician as mandating treatment or is so obvious that even a lay person would perceive the need for a doctor's attention." Id. (quoting Gomez v. Randle, 680 F.3d 859, 865 (7th Cir. 2012)).

Regarding the subjective element, to determine whether the prison official acted with deliberate indifference requires the court to "look into his . . . subjective state of mind." Petties, 836 F.3d at 728 (citing Vance v. Peters, 97 F.3d 987, 992 (7th Cir. 1996)). The plaintiff does not have to show that the defendant "intended harm or believed that harm would occur." Id. On the other hand, "mere negligence is not enough." Id. (citing Estelle, 429 U.S. at 106)). The plaintiff must prove that the defendant "*actually* knew of and disregarded a substantial risk of harm." Id. (citing Farmer, 511 U.S. at 837). Deliberate

indifference "is not medical malpractice; the Eighth Amendment does not codify common law torts." Arnett, 658 F.3d at 751 (quoting Duckworth v. Ahmad, 532 F.3d 675, 679 (7th Cir. 2008)). "A medical professional acting in his professional capacity may be held to have displayed deliberate indifference only if the decision by the professional is such a substantial departure from accepted professional judgment, practice, or standards, as to demonstrate that the person responsible actually did not base the decision on such a judgment." Roe v. Elyea, 631 F.3d 843, 857 (7th Cir. 2011) (quoting Sain v. Wood, 512 F.3d 886, 894-895 (7th Cir. 2008)).

2.    *Analysis*

In his original motion for summary judgment, the plaintiff asserted that the defendant was deliberately indifferent because he denied the plaintiff Tramadol pain medication for serious right knee pain; that the defendant's abrupt withdrawal of the Tramadol, rather than tapering it off, was deliberately indifferent to the withdrawal symptoms such an abrupt withdrawal would cause; and that the defendant's actions were negligent, or constituted malpractice, under Wisconsin law.  The court will address each condition below. Dkt. No. 12 at 14-15. In his supplemental brief, the plaintiff clarified that the second claim related, not to why the defendant discontinued the Tramadol, but to how—he argues that the defendant should have known that abrupt termination, rather than tapering, would result in serious side effects. Dkt. No. 145 at 24-25.

a.    The plaintiff's knee pain

i.    **Objectively serious medical need**

In his opening summary judgment brief (dkt. no. 61), the defendant did

not discuss whether the plaintiff's knee pain constituted a serious medical

need. In his reply brief, however, the defendant asserts that the plaintiff's knee

pain was not a serious medical condition because the plaintiff's own expert, Dr.

Sturm, [5] testified at his deposition that the plaintiff's pain was due to

degenerative changes—wear and tear on his knee—and that such changes

constitute a "serious medical need" only if patients are not "up and

functioning." Dkt. No. 164 at 3. The defendant asserts that the plaintiff's

medical records show that he was "up and functioning, and that his activities

of daily living were not limited by the knee pain. Id. The defendant also argues

that according to Sturm, degenerative changes are "common among adults,

especially in obese adults such as [the plaintiff]." Id. The defendant claims that

"[t]here is no basis in fact to support a conclusion that [the plaintiff's]

particular knee condition was severe enough to constitute a serious medical

need." Id.

The plaintiff responds that he suffered from chronic, "bone on bone" knee

pain, for which he had a valid Tramadol prescription when the defendant first

saw him. Dkt. No. 172 at 10. He points out that the pain was the result of a

sudden injury he suffered in June 2009; his "right knee buckled 40 degrees

---

[5] James Sturm is a medical doctor who specializes in anesthesia and pain
management. Dkt. No. 148-1 at ¶1. He is board certified in anesthesia by the
American Board of Anesthesia. Id. at ¶2.

past straight in the wrong direction," which resulted in his anterior cruciate ligament (ACL) being completely severed, and his lateral and medial menisci being torn. Id. at 2, ¶3. He had to have surgery for this injury—the middle third of his patella tendon was removed to use as a replacement for the ACL, which was anchored with screws, and the medial and lateral menisci were removed. Id. at ¶3. The plaintiff asserts that he has suffered chronic pain, "bone on bone" pain ever since. Id. at ¶4. He disputes that the pain was the result of obesity, or normal wear and tear, or the normal aging process. Dkt. No. 173 at ¶1.

The parties dispute Sturm's deposition testimony on this issue. The defendant argues that Sturm basically testified that the plaintiff's knee pain did not constitute a serious medical need; the plaintiff responds that Sturm said no such thing. Dr. Sturm's deposition transcript is part of the record, and the court has reviewed it.

At the deposition, the defendant's lawyer presented Sturm with a letter on Arch Advanced Pain Management letterhead, bearing Sturm's signature. Dkt. Nos. 161-9; 161-1 at 17-18, dep. pp. 68-70. That document stated that Sturm had reviewed the medical records the plaintiff had sent him, and that Sturm believed that the plaintiff "suffered with chronic significant right knee pain with his degenerative changes in the right knee." Dkt. No. 161-1 at 20, dep. p. 77. Sturm testified that "degenerative changes" meant "[w]ear and tear on the knee. The articular surface that allows the joint to slide easily has broken down exposing bone on bone." Id. at dep. pp. 77-78. Sturm testified

that he had reviewed the plaintiff's medical records, and had concluded that the plaintiff's knee condition was "significant," and that there had been a "significant amount of degenerative changes." <u>Id.</u> at dep. pp. 79-80.

Counsel also showed Dr. Sturm his October 12, 2015 declaration. Dkt. Nos. 161-6; 161-1 at 20, dep. p. 77. Counsel pointed out that paragraph 6 of that declaration characterized the plaintiff's knee pain, and the degenerative changes, as "a serious medical need." Dkt. Nos. 161-1 at 20, dep. p. 80; 161-6 at ¶6. When counsel asked how the plaintiff's knee pain and degenerative changes constituted a "serious medical need," Sturm replied, "It is very important to keep patients up and functioning. Patients who are not moving around are at increased risk of bed sores, blood clots, pneumonia, strophy of the muscles, etc." Dkt. No. 161-1 at 20, dep. p. 80. Counsel then asked whether there was any evidence that the plaintiff had any of those issues. <u>Id.</u> Sturm responded, "He had complaints of limitations secondary to pain after not receiving his meds." <u>Id.</u> at 21, dep. p. 81. Sturm further testified that there was no evidence in the medical records he'd seen that the plaintiff's activities of daily living were limited. <u>Id.</u>

It appears to the court that the parties have a genuine dispute as to an issue of material fact—whether the plaintiff's knee pain in early September 2013, when the defendant terminated the Tramadol prescription, constituted an objectively serious medical need. There is no dispute that the plaintiff had suffered a significant knee injury four years before, and had undergone significant surgical procedures. There is no dispute that, more than once,

doctors had given the plaintiff valid prescriptions for Tramadol to manage that pain. Sturm characterized the plaintiff's knee pain as "chronic" and "significant." He identified "significant" degenerative change in the plaintiff's knee. Sturm testified that when the plaintiff did not receive his "meds," he complained of physical "limitations." This evidence points to an objectively serious medical condition. Sturm also testified that he saw no evidence that the plaintiff's activities of daily living had been limited by the pain; that supports an inference that the plaintiff's pain may not have been objectively serious.

In other deliberate indifference cases relating to knee pain, courts have assumed that knee pain constituted an objectively serious medical need. See, e.g., Norwood v. Ghosh, 723 Fed. App'x 357 (7th Cir. 2018); Zackery v. Mesrobian, 299 Fed. App'x 598, 600 (7th Cir. 2008). It is not appropriate for this court to make that assumption, because the defendant has raised a dispute on the issue. But the dispute indicates that a reasonable jury could find, based on the evidence in the record, that the plaintiff's knee pain constituted a "serious medical need" for Eighth Amendment purposes.

## ii.    **Deliberate indifference**

The defendant argues that even if the plaintiff's knee pain constituted an objectively serious medical condition, he was not deliberately indifferent to that condition. He argues that the plaintiff cannot show that his decision "was such a substantial departure from accepted professional judgment, practice or standards" that it constituted deliberate indifference. Dkt. No. 164 at 5. The defendant says that Sturm himself testified that medical professionals should

start by treating pain with conservative options before prescribing opioids, and that a medical professional had discretion in which treatments to employ. Id. He argues that Sturm testified that the defendant's decision to discontinue the Tramadol would have shown conscious disregard for the plaintiff's pain only if the defendant knew that the plaintiff continued to complain of pain, but provided no alternative treatment options. Id. at 5-6. The defendant says there is no evidence that the defendant knew that discontinuing the Tramadol would cause the plaintiff pain. Id. at 6. He says it is undisputed that he did not receive any of the complaints or health services requests the plaintiff made after the defendant discontinued the Tramadol. Id. The defendant argues that the fact that other doctors might have made different treatment decisions does not mean that he was deliberately indifferent. Id. Finally, he argues that a doctor managing chronic knee pain is not required to eliminate all pain, but to manage the pain. Id. at 6-7.

The plaintiff responds that he does not have to show that the defendant intended to cause him harm—he needs only show that there was a substantial risk of harm, and that the plaintiff disregarded that risk. Dkt. No. 172 at 10. He says that the defendant "discontinued [the Tramadol prescription] abruptly without meeting Plaintiff or reviewing his medical records." Id. He argues that because of this abrupt termination, the plaintiff's knee pain was "exacerbate[ed]" unnecessarily for some four or five days; he characterizes this as an "infliction of pain" that was "unnecessary." Id.

It is undisputed that on September 3, 2013, the day the plaintiff arrived at DCI, the defendant was "working intake." Dkt. No. 60 at ¶17. His "part" of the intake process was to "review medications and confirm continuation of the medications necessary for maintenance of an inmate's health." Id. That part of the process did not involve face-to-face interaction with the inmate. Id. at ¶18. So the defendant did not see the plaintiff that day. The intake nurse compiled a list of the plaintiff's current medications, and gave it to the defendant; this was the *only* document he reviewed on September 3, 2013. Id. at ¶¶21-22. The defendant saw that one of the plaintiff's current medications was Tramadol. Id. at ¶24. Tramadol was not on the DOC approved medications list, because of the possibility of interaction with other drugs and because of its addictive nature, id. at ¶25, and in the defendant's opinion, it wasn't appropriate to use for long-term pain management in patients with a history of drug and alcohol abuse, id. at ¶26. For these reasons, the defendant discontinued the Tramadol. Id. at ¶29. He continued the Meloxicam, and he also prescribed 500 mg. of Tylenol for the plaintiff to take three times a day as needed. Id. at ¶31. The defendant also ordered an expedited intake exam. Id. at ¶34. There is no evidence that the defendant had any other interactions with the plaintiff after he discontinued the Tramadol on September 3, 2013, or that he was aware of the plaintiff's subsequent complaints and health services unit requests.[6]

---

[6] The plaintiff says that it is undisputed that the Health Services Unit got a request from the plaintiff on September 5, 2013. Dkt. No. 172 at 6-7. While that is true, it is not evidence that *the defendant* saw the request, or knew about it.

The parties dispute whether discontinuing Tramadol, and substituting the combination of the Meloxicam and extra-strength Tylenol, posed a substantial risk that a person would suffer unnecessary pain. They argue about medical literature, and expert opinions. Under the facts in the record, however, that isn't the question. The defendant did not see the plaintiff on September 3, 2013, before he discontinued the Tramadol. He did not examine the plaintiff on that date, or question the plaintiff. He did not review the plaintiff's medical records before he discontinued the Tramadol. He looked at one thing—the list of medications the plaintiff was taking—and, based on his opinions about that medication and the fact that it was not on the DOC formulary, discontinued it.

Granted, September 3, 2013 was not the first time the defendant had encountered the plaintiff. The plaintiff alleged in the complaint that the defendant was a treating doctor at the DACC in 2009, when the plaintiff suffered his knee injury. Dkt. No. 1 at ¶5. The defendant agrees that "[i]n 2009, [he] also traveled to the Drug Abuse Correctional Center (DACC) to treat patients at that facility a couple times per month as-needed." Dkt. No. 62 at ¶5. The defendant says that he had two face-to-face encounters with the defendant. Id. at ¶8. The first was on June 3, 2009, at the DACC, when he saw the plaintiff for complaints of an injury to his right fifth finger, pain in his right toe, and allergies. Id. at ¶9. The second was a couple of weeks later, on June 17, 2009 (again at the DACC), when the plaintiff complained of a knee injury suffered while playing volleyball; the defendant says that he thoroughly

31

examined the plaintiff, and concluded that he "may have injured his right medial meniscus." Id. at ¶10. The defendant asserts that "[t]hese were the only face-to-face encounters I have had with [the plaintiff], and constitute my only involvement with treatment of his knee pain." Id. at ¶11.

Over four years passed between the time the defendant had these two encounters with the plaintiff at the DACC, and the time he decided to discontinue the Tramadol. In those four years, the plaintiff had serious surgery on the knee, and was prescribed the Tramadol. The defendant would have no way of knowing this on September 3, 2013, however, because he did not review the plaintiff's medical records or see the plaintiff. The defendant would have had no information about why the plaintiff was taking Tramadol when he discontinued it on September 3, 2013. A reasonable jury could find that his decision to discontinue the Tramadol under these circumstances so far departed from accepted professional judgment, practice or standards that he has demonstrated that the medical decision was not based on such accepted judgment, practice or standards.

The defendant has asserted that there are several good reasons to take an inmate off Tramadol. He has asserts that it is addictive. He asserts that it is an opioid, a risky substance to have in a prison environment. He asserts that Tramadol is not a good pain management option for someone with a substantial history of drug and alcohol abuse. But the relevant question is whether the defendant's decision to discontinue the Tramadol for those reasons without first seeing the plaintiff, or finding out why he was on the Tramadol, or

reviewing his medical records, so deviated from accepted judgment or practice that it wasn't a decision based on accepted judgment or practice. The court notes that when the plaintiff was admitted into DCI in 2011, Dr. Hoftiezer, whom the defendant references as an expert, was the intake doctor. Like the defendant, he noted that the plaintiff was on Tramadol. Instead of discontinuing the Tramadol, however, Hoftiezer continued it *until a Department of Corrections doctor could review the plaintiff's files.* The court concedes that a difference of opinion between two medical professionals does not, standing alone, constitute deliberate indifference. But a reasonable jury could conclude that making any decision about an inmate's medication without, at the very least, reviewing that inmate's medical records, constitutes deliberate indifference.

The defendant also asserts that he was the intake physician on September 3, 2013, and that intake physicians don't meet with new inmates. Dkt. No. 61 at 11. He says that it was institution policy for the intake physician to review only the list of the inmate's current medications, and says that he "did not know that [the plaintiff] allegedly had a serious medical need created by long-term dependence on Tramadol. He knew only that [the plaintiff] was currently taking the medication." Id. The fact that this procedure of deciding whether to continue or discontinue medications without reviewing patient records or seeing the patient was institution policy does not relieve a medical professional of his constitutional obligations. The very fact that the defendant concedes that he had no idea what serious medical need the plaintiff might

have had that had caused someone to prescribe him Tramadol might cause a reasonable jury to conclude that his decision to discontinue it constituted deliberate indifference.

The court will deny both parties' motions for summary judgment as to the plaintiff's claim that the defendant's abrupt cessation of the Tramadol constituted deliberate indifference to his knee pain.

b. The plaintiff's withdrawal symptoms

i. **Objectively serious medical condition**

The defendant asserts that the plaintiff's withdrawal symptoms did not constitute a serious medical need for two reasons: (1) although withdrawal symptoms *can* be life-threatening in some cases (*i.e.*, symptoms such as a ruptured esophagus, stroke or heart attack), the symptoms the plaintiff reports (restlessness, watering eyes, runny nose, nausea, sweating, severe muscle aches, pain and suffering) were not; and (2) the plaintiff has not met his burden to show that he had withdrawal symptoms at all, because there is no evidence that he complained about withdrawal symptoms between September 3, 2013 and September 8, 2013.

Again, the defendant's arguments beg the question. The defendant argues that Tramadol is addictive. He concedes that withdrawal symptoms may be life threatening. Yet he argues that the risk of such withdrawal did not present a serious medical need because, in hindsight, the symptoms the plaintiff says he suffered were not life-threatening. This is a circular argument.

The question is whether withdrawal from an opioid drug can constitute a serious medical need. The court concludes that it can.

## ii. **Deliberate indifference**

The defendant asserts that the plaintiff has not carried his burden of showing that the defendant was deliberately indifferent, because the defendant did not receive any information about the plaintiff's condition after September 3, 2013. He asserts that the plaintiff can't show that the defendant was deliberately indifferent to his withdrawal symptoms, because he can't show that the defendant knew about them.

Again, however, the question is whether the defendant's decision to discontinue the Tramadol without having seen the plaintiff or his records— rather than waiting for someone to review the records, or waiting for the expedited physical exam he had ordered—constituted deliberate indifference to the risk that that decision might subject the plaintiff to serious withdrawal symptoms. The defendant asserts that because all he looked at was the list of the plaintiff's current medications, he "did not know that [the plaintiff] allegedly had a serious medical condition created by long-term dependence on Tramadol." Dkt. No. 61 at 11. That is exactly the point. A reasonable jury could find that the defendant's decision to discontinue the Tramadol without such knowledge constituted deliberate indifference to the risk that the plaintiff might suffer serious withdrawal symptoms.

The defendant argues that there were valid reasons to terminate the Tramadol—its addictive properties, and the plaintiff's drug and alcohol history.

35

But a reasonable jury could conclude that basing his decision on those reasons alone, without finding out how long the plaintiff had been taking the drug or why, constituted deliberate indifference.

The defendant argues that when Dr. Williams examined the plaintiff six days later, on September 9, 2013, Williams did not re-order Tramadol. Id. at 14. He implies that Williams made the same decision that he did, and that this supports the conclusion that the defendant's decision to stop the Tramadol was not deliberately indifferent. This argument ignores the fact that Williams actually *examined* the plaintiff, and that he examined him at a point where the defendant says his withdrawal symptoms had subsided.

Finally, the defendant argues that Hoftiezer agrees with how the defendant handled the situation. Id. at 15. Hoftiezer's testimony might sway a reasonable juror in favor of the defendant. But it does not demonstrate that there is no genuine dispute as to the question of whether the defendant's actions constituted deliberate indifference.

The court will both parties' summary judgment motions as to the plaintiff's claim that the defendant's termination of the Tramadol constituted deliberate indifference to the plaintiff's risk of serious withdrawal symptoms.

C.    Medical Malpractice Claim

The defendant asserts that the court should grant summary judgment in his favor on the plaintiff's state-law malpractice claim. Dkt. No. 61 at 16. The plaintiff asserts that the court should grant *him* summary judgment on this claim. Dkt. No. 12 at 24-27.

To prove a medical malpractice claim, the plaintiff must show the standard of care, must show that the defendant failed to conform to that standard of care, and must show that that failure caused his injury. Carney-Hayes v. Nw Wis. Home Care, Inc., 699 N.W.2d 524, 527 (Wis. 2005), citing Olfe v. Gordon, 286 N.W.2d 573 (1980)). To establish the standard of care, the plaintiff must provide expert testimony. Id. (citing Kuehnemann v. Boyd, 214 N.W. 326 (1927)).

The defendant argues that the plaintiff cannot present expert testimony of the applicable standard of care. Dkt. No. 61 at 16. He acknowledged that the plaintiff has identified Sturm as his expert, but argues that the court should exclude Sturm's testimony, for reasons he stated in his January 15, 2016 motion to exclude Sturm as a witness. Id., referencing Dkt. No. 57, Defendant's Memorandum of Law in Support of Motion to Exclude Plaintiff's Expert Witness James M.G. Sturm, DO DABA. The court denied that motion without prejudice on April 1, 2016. Dkt. No. 98 at 10. The defendant is free to file a motion to exclude Sturm prior to trial, under Daubert v. Merrell Down Pharmaceuticals, Inc., 509 U.S. 579 (1993), but for now, the plaintiff has an expert witness.

The defendant did not address the other elements of a malpractice claim directly, but the court assumes that his arguments on these elements would closely resemble his deliberate indifference arguments—that his decision to terminate the Tramadol did not fall below the standard of care, and did not cause the plaintiff injury. For the reasons the court already has stated, the court concludes that there are genuine disputes as to material facts on those

elements. The court will deny both parties' motions for summary judgment on the plaintiff's medical malpractice claim.

### D. Qualified immunity

In his motion for summary judgment, the defendant argues that he is, as a state official, entitled to qualified immunity. "Generally, qualified immunity protects government agents from liability when their actions do not violate "'clearly established statutory or constitutional rights of which a reasonable person would have known.'"" Hernandez v. Cook Cty. Sheriff's Office, 634 F.3d 906, 914 (7th Cir. 2011) (quoting Purvis v. Oest, 614 F.3d 713, 720 (7th Cir. 2010), which quoted Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)). In considering whether an official is shielded by qualified immunity, the court asks "'(1) whether the facts, taken in the light most favorable to the plaintiff, show that the defendant violated a constitutional right; and (2) whether that constitutional right was clearly established at the time of the alleged violation.'" Id. (quoting Wheeler v. Lawson, 539 F.3d 629, 639 (7th Cir. 2008)).

The defendant frames his qualified immunity argument this way: he says that the plaintiff must show "that it was clear, to someone in [the defendant's] position, that [the defendant] would violate [the plaintiff's] constitutional rights when he discontinued the Tramadol on September 3, 2013." Dkt. No. 61 at 20. That is not an accurate statement. The question is whether the plaintiff's constitutional right to be free from cruel and unusual punishment—in this case, deliberate indifference—was clearly established, whether "[t]he contours of [that] right [were] sufficiently clear that a reasonable official would

understand that what he is doing violates that right." <u>Saucier v. Katz</u>, 533 U.S. 194, 202 (2001). A prisoner's constitutional right to be protected from cruel and unusual punishment is clearly established, and has been for some time. And, viewing the facts in the light most favorable to the plaintiff, the court has found that a reasonable jury might conclude that the defendant violated that right.

The defendant is not entitled to qualified immunity.

## V.     CONCLUSION

The court **DENIES** the defendant's motion for summary judgment. Dkt. No. 59.

The court **DENIES** the plaintiff's motions for summary judgment. Dkt. Nos. 11, 145.

The court will issue a separate notice of hearing, setting up a status conference to discuss next steps.

Dated in Milwaukee, Wisconsin this 28th day of September, 2018.

**BY THE COURT:**

**HON. PAMELA PEPPER**
**United States District Judge**